# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| DAVID NAPLES, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEW CASTLE COUNTY, a Municipal | ) | |
| Corporation, DAVID M. CULVER, | ) | |
| individually and in his official capacity, | ) | C.A. No. N11C-06-242 PRW |
| GEORGE HAGGERTY, individually | ) | |
| and in his official capacity, LATONYA | ) | |
| ASHLEY, individually and in her official | ) | |
| capacity, DAVID HOLSTON, | ) | |
| individually and in his official capacity, | ) | |
| and FRANK RUBERTO, individually | ) | |
| and in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: February 25, 2015
Decided: March 30, 2015

## OPINION

*Upon Defendants' Motion for Summary Judgment,*
**GRANTED.**

Leo John Ramunno, Esquire, Wilmington, Delaware, Attorney for Plaintiff.

Laura T. Hay, Esquire, Assistant County Attorney, Megan Sanfrancesco, Esquire, Assistant County Attorney, New Castle County Office of Law, New Castle, Delaware, Attorneys for Defendants.

**WALLACE, J.**

## I.  INTRODUCTION

Plaintiff, David Naples, has sued his former employer and certain supervisors for claimed violations of his constitutional rights to due process and for defamation. His lawsuit arises out of events that took place in 2009, when he was terminated for breaching the New Castle County Department of Land Use (the "Department") policies relating to his job as an Assistant Land Use Administrator. After conducting an investigation into his work conduct, the Department recommended his termination – a decision that was upheld by the Acting Chief of Human Resources after she conducted a pretermination hearing. Mr. Naples then exercised his appeal rights under the New Castle County Code ("County Code") and requested a hearing before the Human Resources Advisory Board ("HRAB"). The appeal hearing was not scheduled within the time frame prescribed by the County Code, and it was conducted in two separate sessions. The HRAB ultimately reversed the Department's decision to terminate Mr. Naples, finding that although there was just cause supporting a disciplinary decision, termination was too harsh a penalty. Mr. Naples was then reinstated after a five-month period of suspension without pay. He now brings constitutional and defamation claims against New Castle County (the "County") and against the named Defendants in their individual and official capacities. Defendants have moved for summary

judgment as to all claims. For the reasons set forth below, the Defendants' motion is **GRANTED.**

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Mr. Naples worked as an Assistant Land Use Administrator, a merit employee position, in the New Castle County Department of Land Use from 2000 to 2009. His duties included managerial, supervisory, administrative and technical work within the Inspection Division – one of the Department's seven divisions. Mr. Naples resigned from his position for a short period of time from July to August, 2006. He left to start a job in Florida. When the Florida job fell through, the Department hired him back.

In 2007, while still employed by the Department, Mr. Naples began working part-time at a liquor store owned by Michelle Gillen. Mrs. Gillen is married to Larry Gillen, Mr. Naples' friend and a small business owner.

### A. Investigation of Mr. Naples' Departmental Policy Violations

The events giving rise to this lawsuit commenced in March, 2009, when the Department's Assistant General Manager George Haggerty learned that Mr. Naples had facilitated the issuance of a permit to Mr. Gillen prior to the Board of Adjustment ("BOA") issuing a final written decision.[1] Mr. Haggerty discussed the

---

[1]    The BOA controls the issuance of permits within the Land Use Department. Mr. Naples worked in the Inspection Division, a Land Use division which was not involved in issuing permits.

permit with Mr. Naples on March 20, 2009. Mr. Naples then sent Mr. Haggerty an email discussing his relationship with Mr. Gillen and his part-time employment at Mrs. Gillen's liquor store. In that email, Mr. Naples also disclosed his assistance with another of Mr. Gillen's permit applications about three months prior.

Mr. Haggerty consulted with the General Manager of Land Use, David Culver, and determined that an investigation was warranted to determine whether discipline was appropriate. Mr. Haggerty also contacted Mr. Naples' immediate supervisor, David Holston, and Frank Ruberto, a Land Use Administrator, to determine whether Mr. Naples had violated any other departmental policies warranting discipline. Mr. Culver submitted a memo to Mr. Haggerty detailing his knowledge of Mr. Naples' offenses. Additionally, Mr. Haggerty contacted the Acting Chief of Human Resources Officer, LaTonya Ashley, and informed her that an investigation into Mr. Naples' work history was being conducted.

On March 23, 2009, Mr. Culver and Mr. Haggerty met with Mr. Naples and advised him he was being suspended with pay. Mr. Haggerty then led an investigation into Mr. Naples' employment-related conduct.

During the course of the investigation, the Defendants learned that Mr. Naples had violated numerous other Department policies. Mr. Naples was issued five written discipline records. All five records were signed on April 14, 2009, by

Mr. Culver, Mr. Ruberto, and Ms. Ashley. Mr. Naples' signature line indicates that on April 16, 2009, he refused to sign any of the notices.

The first discipline record detailed Mr. Naples' inappropriate contact with and solicitation of another public employee. On November 3, 2008 Mr. Naples emailed a Christiana School District ("CSD") employee, recommending his friend Mr. Gillen's product to reduce electrical usage. Mr. Naples had sent the email using the County's computer system, and he also forwarded the CSD employee's contact information on to Mr. Gillen on November 21, 2008. Mr. Naples then apparently contacted the CSD employee on December 5, 2008, inquiring as to whether she had received the information he had previously sent. This constituted Mr. Naples' first documented offense. It violated several New Castle County Personnel Policy ("NCC Policy") rules involving harming the County's reputation or public trust, and using County property for personal gain or personal business.[2] The recommended action was a written reprimand with review for dismissal.

Mr. Naples' next documented offense involved his approval of a plumbing permit without the required permit application and requisite permit fee. This offense took place on April 24, 2008. It violated Departmental policies involving (1) seeking to prevent harm to the public trust and the County's reputation, and (2)

---

[2]     *See* New Castle County Personnel Policy Rules [hereinafter "NCC Policy"], Ex. C to Defs.' Mot. Summ. J., Policy1.00, Rule 38; Policy 1.00, Rule 23; Policy 4.06.

refusal to follow Departmental policies.[3]  The recommended action was suspension with review for dismissal.

The next discipline record documents Mr. Naples' inspection for Mr. Gillen's finished basement permit on April 29, 2005.  Mr. Naples reportedly engaged in improper conduct harming the County's reputation and public trust, refused to follow Departmental policies and procedures, and violated provisions of the County Code when he performed the final inspection and waived a permit reinspection fee.[4]  Suspension with review for dismissal was recommended.

The next discipline record cites Mr. Naples for accepting a complimentary ticket from Mr. Gillen for a Dallas Cowboys' Game in Dallas, Texas, on or about September 15, 2008.  The ticket value exceeded the County's defined *de minimus* value and was not entered into a gift log.  Mr. Naples' accepting the ticket violated the Departmental gift policy.[5]  Suspension with review for dismissal was recommended.

The last documented offense involved Mr. Naples' most recent; it took place on March 18, 2009.  According to the discipline record, Mr. Naples facilitated the issuance of a building permit for Mr. Gillen in contravention of the Departmental

---

[3]     *See* NCC Policy 1.00, Rule 38; Policy 1.00, Rule 21; Policy 4.1.

[4]     *See* NCC Policy 1.00, Rule 38; Policy 1.00, Rule 21; Policy 1.00, Disciplinary Action #9.

[5]     *See* NCC Policy 1.00, Rule 34; Policy 5.04; Policy 1.1.4 I.

policy requiring the BOA to issue a signed decision granting a variance before a permit may be issued. The record further indicated that Mr. Naples failed to complete required inspection checklists and advice sections as required by Departmental policy. For all of these incidents, including the March 18 permit facilitation, Mr. Naples was cited for refusing to follow Departmental procedures and policies, and for engaging in improper conduct harming the County's reputation and public trust.[6] Dismissal was recommended.

On April 14, 2009, Mr. Culver submitted a written recommendation to Ms. Ashley to terminate Mr. Naples in accordance with the County Code. The letter attached the five disciplinary records mentioned above. As the Code provides, Mr. Naples was suspended without pay pending his pretermination hearing.[7]

### B. Mr. Naples' Pretermination Hearing

Ms. Ashley sent a notice to Mr. Naples on May 1, 2009, stating that she had received a recommendation for his termination, and that he had the right to request a pretermination hearing. Mr. Naples did so. Mr. Naples' pretermination hearing occurred on May 12, 2009, before Ms. Ashley. Mr. Naples had an attorney present and Mr. Gillen as a witness. Mr. Naples presented his position to Ms. Ashley.

---

[6] *See* NCC Policy 1.00, Rule 21; Policy 1.00, Rule 38; Policy 4.1; Policy 5.3.

[7] *See* New Castle Cty. C. § 26.03.907 ("No dismissal of a permanent employee shall take effect until an opportunity for a pretermination hearing. . ."); *Id.* § 26.03.1001 (providing a department general manager may suspend any employee without pay for disciplinary purposes).

County personnel from Land Use, Human Resources, and Legal also attended the hearing, but they did not make a presentation. Mr. Naples was not permitted to question any of the County's witnesses, and he was asked to leave the room after making his presentation.

Ms. Ashley upheld the recommendation for termination and notified Mr. Naples of her decision by letter dated May 19, 2009. In her letter, Ms. Ashley stated that she found the expressions of mitigating circumstances insufficient to overturn the termination recommendation. Mr. Naples' termination became effective April 16, 2009.

### C. HRAB Appeal and Decision

Under the County Code, merit employees have appeal rights, including: (1) a Step I hearing before the Department General Manager; (2) a Step II hearing before the Chief Administrative Officer and Chief Human Resources Officer; and (3) a Step III hearing before the HRAB.[8] The parties mutually agreed to waive Step I and Step II, and, as was his right under the County Code, Mr. Naples sought a Step III hearing before the HRAB.

Mr. Naples' HRAB appeal hearing was conducted in two sessions. The first session took place on August 6, 2009 (thirteen working days after the time period required by the County Code). The appeal was heard by HRAB members. The

---

[8]    *See id.* § 26.03.1101.B. (providing three steps for addressing employees' grievances).

hearing could not be completed in one session due to the voluminous testimony, so it was continued until August 24, 2009. At both sessions, Mr. Naples was represented by counsel and had the opportunity to present witnesses and to cross-examine the County's witnesses.

The HRAB issued a written decision on September 23, 2009. It determined that there was just cause supporting the County's disciplinary actions for some, but not all, of the alleged violations. It further found, however, that termination was too severe of a penalty. The HRAB expressed its concern with "the use of other events, which, in and of themselves, appear to be insignificant but used in an attempt to show a pattern of behavior of Naples."[9] The HRAB directed that Mr. Naples' termination be reversed and remanded the matter to the Office of Human Resources to administer a reprimand for Mr. Naples' conduct. It stated that a period of suspension to the date of the decision would be appropriate.

### D. Reinstatement and Resignation

On September 28, 2009, Mr. Naples met with representatives from the Office of Human Resources about his reinstatement. He informed the representatives that he did not wish to report to his previous supervisors, Messrs. Haggerty, Ruberto, and Day. Mr. Naples was reassigned to the Code Enforcement Department under a different supervisor. Mr. Naples retained his title of Assistant

---

[9] *See* HRAB Notice of Decision, Ex. E to Defs.' Mot. Summ. J. 8.

Land Use Administrator as well as his salary and benefits, but he performed the work of a Property Maintenance Inspector for the Rental Property Program. On January 15, 2010, Mr. Naples resigned from this position.

### III. STANDARD OF REVIEW

Under Delaware Superior Court Rule 56, grant of summary judgment "shall be rendered" upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[10] Summary judgment will not be granted if there is a material fact in dispute or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[11] In considering the motion, "[a]ll facts and reasonable inferences must be considered in a light most favorable to the non-moving party."[12]

### IV. DISCUSSION

Mr. Naples brings essentially two categories of claims: (1) alleged deprivations of constitutional due process; and (2) tort claims of defamation. In his Complaint, Mr. Naples alleges the Defendants "conspired to violate [his] Civil Rights and Constitutional Rights under Federal and State Constitution [sic]."[13] He

---

[10] Super. Ct. Civ. R. 56(c).

[11] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

[12] *Nutt v. A.C. & S. Co., Inc.*, 517 A.2d 690, 692 (Del. Super Ct. 1986).

[13] Compl. ¶ 25.

claims the Defendants "violated [his] Fourteenth Amendment due process rights by depriving [him] of his property rights without due process of the law and the Delaware Constitution and laws by their actions."[14] He further alleges that his Fourteenth Amendment rights to procedural due process were violated.[15]

### A. Delaware Constitutional Claims

Although Mr. Naples asserts in his Complaint that his civil and constitutional rights under the Delaware Constitution were violated, this is all he states.[16] He does not mention a specific provision of the Delaware Constitution, and he presents no discussion or analysis of the "textual language, legislative history, preexisting state law, structural differences, matters of particular state interest or local concern, state traditions, and public attitudes"[17] informing a reading of any applicable provisions of the Delaware Constitution. Mr. Naples presents instead a conclusory assertion that Defendants violated the state constitution. This, without more, will not support a finding that his rights under

---

[14]  *Id.* ¶ 31.

[15]  *Id.* ¶ 37.

[16]  *See id.* ¶¶ 25, 31.

[17]  *Ortiz v. State*, 869 A.2d 285, 291 n.4 (Del. 2008) (providing a framework for addressing Delaware Constitutional arguments); *Jones v. State*, 745 A.2d 856, 864-65 (Del. 1999). *See also Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 662 (Del. 2014) (discussing framework "to determine whether a state constitutional provision affords an independent basis to reach a different result than what could be obtained under federal law.")

the Delaware Constitution were violated.[18] Accordingly, the Court analyzes and resolves Mr. Naple's arguments under the Fourteenth Amendment of the United States Constitution only.[19]

## B. Federal Substantive Due Process

To the extent Mr. Naples makes a substantive due process claim,[20] the Court finds judgment for the Defendants thereon must be granted. If an interest is not considered a "fundamental right," then the alleged offending state action falls "entirely outside the ambit of substantive due process and will be upheld so long as the state satisfies the requirements of procedural due process." It is well-settled that public employment is not viewed as a "fundamental right" worthy of the

---

[18] *See Doe*, 88 A.3d at 662. *See also Stafford v. State*, 59 A.3d 1223, 1231-32 (Del. 2012) *as corrected* (Mar. 7, 2013); *Wallace v. State*, 956 A.2d 630, 637-38 (Del. 2008) (finding conclusory statement that sentence violates the Delaware Constitution waived claim in both in this Court and the Supreme Court).

[19] *See Stafford*, 59 A.3d at 1231-32; *Ortiz v. State*, 869 A.2d at 290-91. Even if Mr. Naples had properly argued an independent basis for recovery under the Delaware Constitution, our courts have interpreted the due process clause in the Delaware Constitution "'similarly,' 'co-extensively' or with substantially equivalent meaning" as under its federal due process jurisprudence. *Whitwell v. Archmere Acad., Inc.*, 2008 WL 1735370, at *2 (Del. Super. Ct. Apr. 16, 2008); *see also Cohen v. State ex rel. Stewart, CIR-ML*, 89 A.3d 65, 86 (Del. 2014) ("Delaware constitutional due process is coextensive with federal constitutional due process."); *Gen. Elec. Co. v. Klein*, 106 A.2d 206, 210 (Del. 1954) ("[I]n deciding a case of due process under our Constitution we should ordinarily submit our judgment to that of the highest court of the land, if the point at issue has been decided by that Court.").

[20] The substantive component of the Fourteenth Amendment Due Process Clause protects against government officials' arbitrary exercise of power. *See Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000).

protection of substantive due process under federal law.[21] Mr. Naples therefore does not meet the threshold criteria of possessing a property interest protected by substantive due process, and the alleged violation of his due process rights will be analyzed under procedural due process law.

### C. Federal Procedural Due Process

Mr. Naples alleges both his property interest in his employment and his liberty interest in his reputation were violated by the Defendants' actions.

### 1. Property Interest

Mr. Naples must first establish that he has a property interest in his employment that is afforded procedural due process.[22] No doubt Mr. Naples had a qualifying property interest in his employment as a merit employee who could only be terminated for cause.[23] Thus, Mr. Naples had a protected property interest in his position as an Assistant Land Use Administrator.

---

[21] *Id.* at 143 (viewing public employment as a "wholly state-created contract right" bearing "little resemblance to other rights and property interests that have been deemed fundamental under the Constitution"); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 234 n.12 (3d Cir. 2006) (Third Circuit has "held explicitly that public employment is not a fundamental right entitled to substantive due process protection").

[22] *See Barber v. City of Lewes*, 1997 WL 127951, at *7 (Del. Super. Ct. Jan. 31, 1997) (employee only has protected property interest if "a source independent of the Federal Constitution, such as state law, creates the right").

[23] *See Stanford v. State Merit Emp. Relations Bd.*, 2012 WL 1549811, at *4 (Del. May 1, 2012) (termination "for cause" creates property interest in state employment); *Barber*, 1997 WL 127951 at *8 (dismissal for just cause creates protected property interest). The County Code provides: "[d]ismissals are discharges or separations made for delinquency, misconduct, inefficiency or inability to perform the work of the position satisfactorily." New Castle Cty. C. §

-13-

Next, the Court must determine what process Mr. Naples was due. What process is due is a matter of federal constitutional law.[24] As an "essential principle of due process," notice and an opportunity to be heard must precede a deprivation of life, liberty, or property.[25] Specifically, one must be given "an opportunity for a hearing *before* he is deprived of any significant property interest."[26]

In the employment context, a plaintiff with a protectable property interest is entitled to "some kind of a hearing" before the State can deprive him of his employment.[27] This hearing, "though necessary, need not be elaborate."[28] The formality and specific procedures may vary according to "the importance of the interests involved and the nature of the subsequent proceedings."[29] And

---

26.03.907. It further provides that "[w]ith the prior approval of the Chief Human Resources Officer, a department general manager may demote an employee for cause." *Id.* § 26.03.1001.

[24] *See McDaniels v. Frick*, 59 F.3d 446, 458 (3d Cir. 1995) (citing *Vitek v. Jones*, 445 U.S. 480, 491 (1980)).

[25] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

[26] *Id.* (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original)).

[27] *Loudermill*, 470 U.S. at 542; *see also Barber*, 1997 WL 127951, at *9. The pretermination hearing balances the individual's private interest in retaining employment with the governmental interest in managing its personnel. *Loudermill*, 470 U.S. at 542-43.

[28] *Loudermill*, 470 U.S. at 545.

[29] *Id.*

-14-

"something less than a full evidentiary hearing is sufficient prior to adverse administrative action."[30]

Here, as a public employee who could only be terminated for cause, Mr. Naples was owed "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."[31]

Now, the Court must determine whether the County[32] provided the necessary procedures. Mr. Naples alleges it has failed to do so in three ways: (1) the pretermination hearing lacked an impartial hearing officer; (2) the pretermination hearing and subsequent decisions were untimely; and (3) in his view, his post-termination hearing reinstatement violated the County Code by permitting a suspension of greater than 30 days.[33]

---

[30]    *Id.*

[31]    *Id.* at 546; *see also Stanford v. State Merit Employment Relations Bd.*, 2012 WL 1549811, at *4 (Del. May 1, 2012) (process due in employment arena is some opportunity for the employee to present his or her side of the case before the termination).

[32]    The individual defendants were sued in their official and individual capacities. The Court will treat the claims against the Defendants in their official capacities as claims against New Castle County itself. *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004) ("A suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself.").

[33]    Pl.'s Answering Br. Opp'n 6. Mr. Naples does not challenge whether he received adequate notice of the proceedings. *See id.* at 7.

### a. Impartial Hearing Officer

Mr. Naples alleges Ms. Ashley was not an "impartial" hearing officer because she also took part in the investigation against him. He also surmises that Ms. Ashley did not in fact author the pretermination hearing decision, and complains that references to Mr. Haggerty were improperly deleted from that decision. This purported bias, according to Mr. Naples, deprived him of procedural due process. He argues that the "some kind of hearing" required under *Loudermill* is one over which an "impartial" pretermination hearing officer, as defined by him, presides.

"It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property."[34] If an individual believes that the procedures are biased, due process requires an opportunity to present and demonstrate that bias.[35] The challenger must first establish as a threshold matter that the alleged bias resulted in harm or prejudice.[36] Mr. Naples was afforded the

---

[34]    *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).

[35]    *See id.* 1561-62. There are two scenarios: contemporaneous and subsequent realization that the procedures are biased. In the first scenario, where the individual recognizes the bias at the time of the proceedings, "courts usually require that the challenger contemporaneously object to the bias." *Id.* at 1562. Otherwise, that objection is waived. *Id.* In the second scenario, where bias is recognized after the proceedings, the challenger must demonstrate that he or she has been harmed or prejudiced by the bias. *Id.*

opportunity to present and demonstrate Ms. Ashley's alleged bias at his Step III hearing before the HRAB, where he posited that Ms. Ashley's involvement in the investigation was improper and had resulted in his termination. He makes those same allegations here.

Even a genuine demonstration that the decisionmaker was biased "is not tantamount to a demonstration that there has been a denial of procedural due process."[37] The State is not required to provide an impartial decisionmaker at a pretermination hearing.[38] Rather, the State is only obligated to provide a way for the employee to "receive redress for the deprivations."[39] As the Third Circuit Court of Appeals observed, requiring pretermination decisionmakers in the employment context to be unfamiliar with the employee and the circumstances leading to the adverse employment action "in every instance would as a practical matter require that termination decisions initially be made by an outside party rather than the employer."[40] This is not only "unduly cumbersome" for the

---

[36] *Id.* ("Due process requires that the challenger have an opportunity to object to the alleged bias, and courts consequently have instituted procedures to address allegations of bias and to set aside bias-tainted outcomes. Typically, courts require that the challenger meet a threshold test of demonstrating harm or prejudice resulting from the alleged bias before they will reopen a closed case.").

[37] *Id.*

[38] *Id.*

[39] *Id.* (quoting *Schaper v. City of Huntsville*, 813 F.2d 709, 715-16 (5th Cir. 1987)).

[40] *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995).

-17-

employer, but it may also be "unreasonably invasive for the employee, who may want to keep the circumstances of his discharge private."[41] Moreover, where the State provides a "neutral tribunal at the post-termination stage," allegations of an impartial pretermination decision maker are neutralized and "excessive pretermination precaution" is unnecessary.[42]

What is more, courts have declined to find bias where the adjudicator first acts as an investigator, without more.[43] Plaintiffs challenging a biased adjudicator who also played an investigative role must overcome the "presumption of honesty and integrity in those serving as adjudicators."[44]

The County Code provides:

> No dismissal of a permanent employee shall take effect until an opportunity for a pretermination hearing is given the employee and the department general manager gives to such employee a written statement setting forth the reasons therefor and files a copy of such statement with the Chief Human Resources Officer.[45]

---

[41] *Id.*

[42] *Id.; see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 n.12 (1985) ("[T]he existence of post-termination procedures is relevant to the necessary scope of pretermination procedures.").

[43] *See Walls v. City of Milford*, 938 F. Supp. 1218, 1225 (D. Del. 1996) (finding city employee failed to show bias in manager's combination role of investigator and decisionmaker for employee's suspension and termination).

[44] *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (finding no bias in license termination procedures where board first investigated the alleged conduct and later presided over the hearing).

[45] New Castle Cty. C. § 26.03.907.

But County employees "should have a reasonable opportunity to be heard on their legitimate grievances."[46] And Mr. Naples did here. Once a pretermination decision has been reached, the employee then has three appeal steps: (1) a written decision by the department general manager; (2) an appeal to and decision by the Chief Administrative Officer and Chief Human Resources Officer; and (3) an appeal to the Human Resources Advisory Board. The post-termination remedies here provide for an entirely different arbiter at the third stage, thus providing a neutral tribunal at a post-termination stage.

Also, there is no record evidence here that Ms. Ashley was biased in serving as decisionmaker in the pretermination hearing after being alerted to the investigation. Ms. Ashley was aware of the investigation, signed Mr. Naples' discipline records, and consulted with Mr. Haggerty after the pretermination hearing about the allegations in the discipline record.[47] These facts alone are insufficient to overcome the presumption of honesty and integrity afforded to adjudicators. The Court finds there is no evidentiary support in the record for a due process claim because of Ms. Ashley's involvement in the underlying investigation and pretermination hearing.

---

[46]     *Id.* § 26.03.1101 (providing grievance procedures).

[47]     Latonya Ashley Dep., Ex. 1 to Pl.'s Answering Br. Opp'n at 49-52. Mr. Naples' allegation that Ms. Ashley had others within the Office of Human Resources provide input into draft versions of the decision letter, even if true, lacks significance.

### b. Delays in Hearings and Decisions

While federal constitutional law provides the requirements for pretermination procedures, post-termination proceedings are a matter of applicable state law.[48] Merely alleging that the procedures took too long does not support a due process claim.[49] Indeed, Delaware law holds that if only property rights are involved, "mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of the liability is adequate."[50]

Under the County Code an employee may request an appeal from a pretermination decision. If the employee does so, the Chief Human Resources Officer must arrange a meeting of the HRAB to conduct a hearing "at the earliest possible date," but no later than "thirty (30) working days" after the Chief Human Resources Officer receives the request.

---

[48] *See Loudermill*, 470 U.S. at 546 (Court looked to state administrative code for guidance on length and timing of administrative procedures in determining whether post-termination procedures violated due process rights).

[49] *Id.* at 547 (finding a "9-month adjudication is not, of course, unconstitutionally lengthy *per se*").

[50] *Cohen v. State ex rel. Stewart, CIR-ML*, 89 A.3d 65, 87 (Del. 2014) (citing *Slawik v. State*, 480 A.2d 636, 646 (Del. 1984)). *Cf. Phillips v. Comm'r of Internal Revenue*, 283 U.S. 589, 596-97 (1931).

Ms. Ashley allegedly acknowledged receipt of Mr. Naples' request for an appeal on June 8, 2009.[51]  The first session of the HRAB hearing was scheduled for and took place on August 6, 2009, which is more than thirty days after the request.  The second session took place on August 24, 2009.  Although the HRAB hearings did not take place within the time provided for in the County Code, they were a matter of a few weeks late.  There is no genuine issue of material fact as to this scheduling.  Mr. Naples was afforded not one but two sessions of an appeal hearing – at which he was given a full opportunity to present evidence and arguments.  This record evidence cannot support, as a matter of law, that the late scheduling of the HRAB hearing sessions deprived Mr. Naples of due process.

### c.  Suspension under the County Code

Mr. Naples alleges that his suspension without pay status from April 16, 2009 until his reinstatement on September 28, 2009[52] violated the County Code, which, in turn, violated his due process rights.[53]  Section 26.03.1001 of the County Code states: "A department general manager may, for disciplinary purposes,

---

[51]     Compl. ¶ 19.

[52]     Mr. Naples claims he was without pay or benefits from April 14, 2009 until September 28, 2009.  Ms. Ashley's termination letter and the HRAB decision indicate that his employment was terminated effective April 16, 2009.

[53]     Mr. Naples' characterizes his complaint with the HRAB's decision as follows.  Under the heading "The Defendant's [sic] Did Not Afford Plaintiff Appropriate Procedural Due Process," he contends: "Plaintiff was denied his right to an impartial hearing officer and the Defendant's [sic] violated their own time deadlines and his suspension according to their own code can not be more than 30 days during a 12 month period."  Pl.'s Answering Br. Opp'n 6.

-21-

suspend without pay any employee in his or her department for a length of time not to exceed thirty (30) days in any twelve (12) month period." Mr. Naples believes this provision cabins decisions of the HRAB. In his view, the HRAB lacked authority to impose a 5-month suspension without pay.

While the clear language of § 26.03.1001 does limit suspensions imposed by a *department general manager* to thirty days, there is no similar time limit on the HRAB. Section 26.03.010 states:

> Upon completion of his or her probationary period, any employee who is dismissed, demoted, suspended or otherwise disciplined, in accordance with Article 3 of this Chapter or the New Castle County discipline policy, may appeal to the Human Resources Advisory Board for review thereof, in accordance with the grievance procedures set forth in the rules and regulations. [. . .] *The Board shall have the power to reduce or increase the penalties should it find them inappropriate for the offense committed.*

Unlike the limitation placed on the department general managers, the County Code grants the HRAB authority to modify penalties – that being, penalties actually inflicted, not just possible – without restrictions. Applying the well-established principles of statutory construction, where each provision of a code or statute is intended for some useful purpose, it is clear that the drafters intended a distinction between the authority to impose penalties vested in departmental

general managers and that vested in the HRAB.[54]   The   HRAB   exercised   its authority to reduce Mr. Naples' penalty inflicted from termination to a mere 5-month unpaid suspension.

## 2. Liberty Interest

Although Mr. Naples specifically alleges infringement on a property interest in his Complaint, he also argues in his response brief that his liberty interest in his good name and reputation was compromised by the Defendants' alleged defamatory remarks made during their investigation of his conduct.

An "employment action implicates a Fourteenth Amendment liberty interest only if it (1) is based on a charge against the individual that might seriously damage his standing and associations in his community by impugning his good name, reputation, honor or integrity; or (2) if the charge imposed such a stigma as to foreclose his freedom to take advantage of other employment opportunities."[55] To state a claim for deprivation of a liberty interest, the employee must establish that he or she had a liberty interest and that defamatory statements were made about him or her.[56] This is known as the "stigma-plus" test, under which a plaintiff

---

[54]   *See, e.g.*, *Colonial Ins. Co. of Wisconsin v. Ayers*, 772 A.2d 177, 181 (Del. 2001) (applying statutory construction rule that "when different terms are used in various parts of a statute, it is reasonable to assume that a distinction between the terms was intended").

[55]   *Barber v. City of Lewes*, 1997 WL 127951, at *11 (Del. Super. Ct. Jan. 31, 1997) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

[56]   *Id.*

-23-

must establish damage to his or her reputation "*plus* deprivation of some additional right or interest."[57] If the plaintiff proceeds under a claim of damage to reputation, the plaintiff must also prove that the published information was untrue or misleading.[58] If the employee is successful, the only process due is a name-clearing hearing.[59]

Defamatory statements by themselves do not, however, amount to a constitutional violation – state tort law may handle damage to reputation alone.[60] Just because the State "may be characterized as the tortfeasor" does not mean that the Fourteenth Amendment Due Process Clause "should *ex proprio vigore* extend to [one] a right to be free of injury."[61] "[S]uch a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States."[62]

---

[57] *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006); *Barber*, 1997 WL 127951 at *11 (stigma must be accompanied by a deprivation of present or future employment).

[58] *Barber*, 1997 WL 127951 at *12.

[59] *Hill*, 455 F.3d at 236 (once plaintiff has established a deprivation of a liberty interest under the stigma-plus test, "the employee is entitled to a name-clearing hearing").

[60] *See Paul v. Davis*, 424 U.S. 693, 706 (1976). Although the United States Supreme Court "has recognized the serious damage that could be inflicted by branding a government employee as 'disloyal,' and thereby stigmatizing his good name," the Court "has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Id.*

[61] *Id.* at 701.

[62] *Id.*

The crux of Mr. Naples' deprivation of liberty interest claim is his complaint that the Defendants made "defamatory" statements about him during their investigation of his conduct. According to Mr. Naples, the statements Mr. Haggerty made to witnesses or involved others during his investigation ("playing both sides of the fence"; that he was "serving two masters"; that he was a "bad egg"; and that he was "working for the liquor store") were defamatory and harmed his reputation. Mr. Naples has not, however, provided evidence that these statements created some stigma, much less that they were in connection with a *deprivation* of an additional right or interest as required under the stigma-plus test.[63] For instance, he offers no evidence that these statements: impacted Ms. Ashley's decision to uphold his termination; contributed to his separation from the Department;[64] or impeded his ability to find future employment. As explained

---

[63] *See Hill*, 455 F.3d at 236 ("In the public employment context, the 'stigma-plus' test has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest.") (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)). *See also Eastburn v. Delaware Dep't of Transp.*, 2009 WL 3290809, at *5 (Del. Super. Ct. Sept. 21, 2009) (finding a name-clearing hearing is required when "a state employee is derived of a right or interest and defamed in the process").

[64] The parties did not squarely place a constructive discharge issue before the Court, although the Court did question counsel about such at the hearing. There, Mr. Naples argued that he was reassigned to a position for which he was over-qualified – performing inspections in neighborhoods where he preferred not to go. *See* Mot. Tr., Aug. 1, 2014, at 22:18 – 23:6. To establish a claim for constructive discharge, a plaintiff generally must show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 832 (Del. 2005). Even a "hostile" work environment, without more, is legally insufficient to support a constructive discharge claim. *Id.* Mr. Naples has not submitted sufficient evidence to support such a claim here – reassignment to a position he

-25-

above, Mr. Naples' deprivation-of-a-property-interest-without-due-process claim fails. And this deprivation of liberty claim is merely a defamation claim that should be analyzed under applicable state tort law, not federal due process law. Thus, summary judgment on any and all due process claims is **GRANTED** to the Defendants.

### D. Defamation Claims

Mr. Naples alleges Defendants "committed slander per se as well as libel and slander by telling all that would listen that Mr. Naples was terminated from employment because he violated NCC Policy 1.00 Rule 34 by accepting any financial or other rewards or gifts for service rendered and engaged in improper conduct."[65] Mr. Naples specifically claims that the Defendants made the following "defamatory" statements: (1) that Mr. Naples was "playing both sides of the fence"; (2) that he was "serving two masters"; (3) that he was a "bad egg"; (4) that he was "working for the liquor store"; and (5) that he was an "a\*\*hole." Mr. Naples further alleges that Mr. Culver "called [him] a criminal on at least two occasions," including during the HRAB hearing.[66]

---

personally finds less desirable, without more, is not enough to show intolerable conditions compelling resignation.

[65]    Compl. ¶ 28.

[66]    After the Court requested clarification on the specific statements made by any Defendant that Mr. Naples was alleging were defamatory (Trans. I.D. # 55967620), Mr. Naples only

-26-

The statute of limitations in Delaware for defamation claims is two years.[67] Defamation claims accrue on the date the alleged defamatory statement is communicated to a third party.[68] According to Mr. Naples, the statements Mr. Haggerty made to third parties during his investigation ("playing both sides of the fence"; "serving two masters"; "bad egg"; and "working for the liquor store") all were made between March 25, 2009 and April 16, 2009.[69] Mr. Naples did not file his complaint until June 24, 2011. Mr. Naples' defamation claims as to these four statements are therefore time-barred.

Mr. Naples claims he heard the fifth statement *after* he had already been reinstated. Mr. Naples testified in his deposition that about a month after his reinstatement, he was walking down the hallway next to the code enforcement

addressed the five enumerated above. *See* Pl.'s Supplemental Mem. 2. The Court assumes Mr. Naples is not abandoning his claim as to the statements Mr. Culver made at the HRAB hearing.

[67] DEL. CODE ANN. tit. 10, § 8119 (2014) ("No action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which it is claimed that such alleged injuries were sustained. . ."); *DeMoss v. News-Journal Co.*, 408 A.2d 944, 945 (Del. 1979) (affirming lower court's application of § 8119 to libel claim); *Abbott v. Gordon*, 2008 WL 821522, at *23 (Del. Super. Ct. Mar. 27, 2008) (applying § 8119 in defamation claim).

[68] *Abbott*, 2008 WL 821522, at *23 (citing *Williams v. Howe*, 2004 WL 2828058, at *3 (Del. Super. Ct. May 3, 2004).

[69] *See* David Allen Naples Dep., Ex. A to Defs.' Resp. to Pl.'s Supplemental Mem. at 159:17-160:24 (testimony regarding the "bad egg" statement); *Id.* at 159:19 (referring to "serving two masters" comment); *see also* Pl.'s Resp. to Defs.' First Set of Interrogs. No. 9 ("Between 3/25/09 and 4/16/09, George Haggerty interrogated Robert Paolo in Wayne Merrit's office about his relationship with me. According to Paolo, Haggerty stated that 'Naples is playing both sides of the fence and serving two masters,' 'working for the liquor store' and he called me a 'bad egg'.").

office when he overheard a conversation in which "Naples" and "a\*\*hole" were used "in the span of about ten to fifteen seconds."[70] He claims Defendants Frank Ruberto and David Holston were involved in the conversation.[71] Mr. Naples also testified that about that same time he overheard another conversation from the hallway outside of the code enforcement office involving one of his colleagues and Mr. Ruberto. Mr. Naples says on that occasion he heard "we got that guy," although he did not hear his name uttered.[72]

Defamation consists of the "twin torts" of libel (written defamation) and slander (spoken defamation).[73] Defamation is generally understood as "a false publication calculated to bring one into disrepute."[74] The elements under Delaware law are: (1) a defamatory communication; (2) publication; (3) reference to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.[75] The general rule is that slander is not actionable without proof of special damages.[76] There is, however, an exception to

---

[70] David Allen Naples Dep., Ex. A to Defs.' Resp. to Pl.'s Supplemental Mem. at 68:8 – 69:16.

[71] *Id.* 70:7-11.

[72] David Allen Naples Dep., Ex. F to Defs.' Mot. Summ. J. 72:1-17.

[73] *Read v. Carpenter*, 1995 WL 945544, at \*2 (Del. Super. Ct. June 8, 1995).

[74] *Id.* (citing *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978)).

[75] *Read*, 1995 WL 945544, at \*2.

[76] *Spence*, 396 A.2d at 970 (Del. 1978).

that rule for the four "traditional" categories of defamation, commonly called slander *per se*, where proof of special damages is not required.[77] The four categories constituting slander *per se* are statements which: (1) malign a person's trade, profession, or business; (2) impute a crime; (3) impute a loathsome disease; (4) impute a woman is unchaste.[78] Libel, on the other hand, is actionable without proof of special damages.[79]

Mr. Naples complains of Mr. Culver's testimony during the post-termination hearing that his "initial concern . . . as [he] dug deeper . . . was . . . that there could be criminal activity that could also have been involved with this action."[80] This reference is the sole factual support for Mr. Naples' slander *per se* claim. Mr. Culver made this statement during the HRAB hearing at which the investigation into Mr. Naples' termination for violating departmental policies was at issue.

Defendants argue that the Mr. Culver's statement is, if considered defamatory, privileged. Delaware law recognizes an absolute privilege "that protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming

---

[77] *Read*, 1995 WL 945544, at *2; *Spence*, 396 A.2d at 970.

[78] *Spence*, 396 A.2d at 970.

[79] *Id.* at 971 (no special damages required for libel "whether the defamatory nature is apparent on the face of the statement or only by reference to extrinsic facts").

[80] Pl.'s Response to Defs.' First Set of Interrogs. No. 9.

the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case.'"[81]  Alternatively, a qualified or conditional privilege may attach to "communications made between people who have a 'common interest for the protection of which the allegedly defamatory statements that are made' or which are 'disclosed to any person who has a legitimate expectation in the subject matter.'"[82]

Mr. Naples argues in response that the statements were not privileged because they were made with malice.  A defendant forfeits the conditional privilege defense if the plaintiff can show it was exercised in bad faith, with malice, or with knowledge of falsity or desire to cause harm.[83]  There is no record evidence to support this essential showing by Mr. Naples.

To the extent Mr. Culver's reference to criminal activity qualifies it for consideration as slander *per se*, Mr. Naples fails to otherwise establish that it is defamatory.  Mr. Culver did not state that Mr. Naples *was* a criminal – he was instead expressing the goal of his part of the investigation: to determine if any criminal activity was underway.  This is a true statement of his concerns that there

---

[81]     *Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992).

[82]     *Gilliland v. St. Joseph's at Providence Creek*, 2006 WL 258259, at *9 (Del. Super. Ct. Jan. 27, 2006) (citations omitted).

[83]     *Meades v. Wilmington Hous. Auth.*, 2005 WL 1131112, at *2 (Del. May 12, 2005).

*could* be criminal activity. "Truth is an absolute defense to a defamation action."[84]

Thus, the factual record cannot support a defamation claim as a matter of law.

Additionally, it remains an undisputed fact that Mr. Naples *was* in fact initially terminated in part because of his violations of the departmental gift policy. Thus, this statement, to the extent Mr. Naples believes it actionable, likewise cannot give rise to a defamation claim.

Mr. Naples' claim regarding those statements would fail as a matter of law, even if they were defamatory. The Defendants are protected here by conditional privilege. Mr. Culver's statement made at the HRAB hearing was made to those who had a legitimate interest in deciding whether to uphold the Department's termination decision, and it was made for that purpose. Further, the statement exhibits no actual malice. Thus, even if the Court could parse an issue of material fact as to whether Mr. Culver's comment was slander *per se*, as a matter of law, his statement was protected by qualified privilege that Mr. Naples has failed to demonstrate in the evidentiary record was forfeited.

---

[84]     *Davis v. W. Ctr. City Neighborhood Planning Advisory Comm., Inc.*, 2003 WL 908885, at *4 (Del. Super. Ct. Mar. 7, 2003) *aff'd,* 836 A.2d 513 (Del. 2003) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1155 (Del. 1981)).

Finally, as to the conversations Mr. Naples allegedly heard in the hallway near the code enforcement office, the Court finds that these cannot support a claim for slander.

While the Court may draw reasonable inferences from the evidence in the light most favorable to a non-moving plaintiff, it will not draw unreasonable inferences.[85] Summary judgment may be granted if the evidence is "*merely colorable, or is not significantly probative*."[86] Mr. Naples could not state that the conversation where he heard "we got that guy" even referred to him, thus failing to establish a requisite element of defamation. As to the words "Naples" and "a**hole" being uttered within ten to fifteen seconds, the Court, drawing reasonable inferences in the light most favorable to Mr. Naples, the non-moving party here, cannot find these alone support a claim for defamation. Again, the reference to Mr. Naples separated in time from an isolated expletive is, at best, merely colorable evidence of a defamatory comment aimed at Mr. Naples. But even if the Court were to find otherwise, this would be the expression of an opinion. Such expressions are generally not actionable.[87]

---

[85]    *Smith v. Delaware State Univ.*, 47 A.3d 472, 477 (Del. 2012) ("This Court will not draw unreasonable inferences in favor of the non-moving party.")

[86]    *Health Solutions Network, LLC v. Grigorov*, 2011 WL 443996, at *2 (Del. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (emphasis in original)).

[87]    *Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *7 (Del. Super. Ct. Apr. 30, 2009) ("[P]ure statements of opinion are not actionable. . .").  Where an opinion implies the

-32-

Viewing the facts in the light most favorable to Mr. Naples, the non-moving Plaintiff, and drawing all reasonable inferences in his favor, the Court cannot find the existence of a genuine issue of a material fact on Mr. Naples' timely filed defamation claims. Summary judgment is therefore **GRANTED** to the Defendants.

### E. Implied Covenant of Good Faith and Fair Dealing

Defendants seek dismissal of Mr. Naples' allegation that "Defendants' actions violated Delaware's covenant of good faith and fair dealing."[88] Mr. Naples argues that the Defendants manufactured false grounds for his termination, which "revolved around" an alleged feud between Mr. Haggerty and Mr. Gillen. Mr. Naples also argues that a certain memo prepared by Defendant David Holston for Mr. Haggerty's investigation provided misinformation about his conduct that led to his termination.

---

assertion of an objective fact, and if that fact may be found to be false, that may, however, support a claim for libel. *Id.* The Court must therefore consider whether the statement, "considered from the viewpoint of the average" recipient, in its entire context, implies a false assertion of fact. *Id.* Referring to another in a crude, but graphic, anal term, to the average recipient, would not imply a fact, let alone a false assertion of a fact. The Court need not address this statement any further.

[88] Compl. ¶ 34.

The implied covenant of good faith and fair dealing can be triggered by, *inter alia*, an employer's manufacturing fictitious grounds for termination.[89] But, the covenant is narrowly construed.[90]

Here, there is no record evidence that the decision to terminate Mr. Naples was based on Mr. Haggerty's purported dislike of Mr. Gillen or on any information that was not documented and supported by departmental records. Nor is there evidence that the five disciplinary actions that served as the basis for the initial termination recommendation – a recommendation addressed and remediated by the HRAB to a mere suspension – were "manufactured" by the Defendants. Mr. Naples therefore does not have sufficient evidence to support any claim for a breach of the implied covenant of good faith and fair dealing here. Judgment as a matter of law is, therefore, due the Defendants and is **GRANTED** on this claim.

### F. Intentional Infliction of Emotional Distress ("IIED")

Mr. Naples alleges in his Complaint that the Defendants "intended to inflict distress upon [him]" by acting in "bad faith with malice and deceitful acts and manufacturing false grounds in an attempt to terminate [him] . . . intentionally and

---

[89] *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443-44 (Del. 1996).

[90] *Id*. at 442.

recklessly without probable cause or merit."[91]  This alleged "outrageous and extreme" conduct "caused [him] extreme emotional distress."[92]

The Defendants have moved for summary judgment on this intentional infliction of emotional distress claim.  They contend that Mr. Naples has failed to present any evidence of extreme or outrageous conduct here.  Moreover, Defendants say the alleged harm took place "beginning in March 2009,"[93] but the complaint was not filed until June 2011.  Defendants argue the two-year statute of limitations for personal injuries therefore bars Mr. Naple's IIED claim.[94]

Mr. Naples did not respond to the Defendants' arguments in his initial briefing, at oral argument, or in his supplemental briefing.  The Court will therefore **GRANT, as unopposed,** summary judgment as to the IIED claim.[95]

### G. Conspiracy Claims

Delaware law defines civil conspiracy as "the combination of two or more persons or entities either for an unlawful purpose, or for the accomplishment of a

---

[91]     Compl. ¶ 40.

[92]     Compl. ¶ 41.

[93]     Defs.' Mot. Summ. J. 28.

[94]     *See* DEL. CODE ANN. tit. 10, § 8119 (2014); *Lankford v. Scala*, 1995 WL 156220, at *5 (Del. Super. Ct. Feb. 28, 1995) (dismissing plaintiffs' IIED claims "[b]ecause emotional injuries are personal injuries for statute of limitations purposes, [and] a two-year limitations period applies to such claims.").

[95]     *See* Super. Ct. Civ. R. 56(e) ("If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

lawful purpose by unlawful means, resulting in damage."[96] Civil conspiracy is not an independent cause of action in Delaware – it must arise from some underlying wrong.[97]

The essence of Mr. Naples' civil conspiracy claim is that because emails were exchanged between Department managers conducting the investigation, the Defendants "were involved in a conspiracy to illegally and unlawfully terminate" Mr. Naples' employment.[98] Without a clearer statement of the underlying wrong, the Court must assume that Mr. Naples is alluding to his claims for denial of due process and defamation to support his civil conspiracy claim. As these claims lack evidentiary support, Mr. Naples cannot establish an underlying wrong on which to hang his civil conspiracy claim. Summary judgment is **GRANTED** on this claim.

---

[96]    *Brooks-McCollum v. Shareef*, 2006 WL 3587246, at *3 (Del. Super. Ct. Nov. 1, 2006).

[97]    Delaware follows the majority approach in requiring the existence of an underlying tort for a civil conspiracy claim. *See, e.g.*, *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987) (setting forth elements plaintiff must prove for civil conspiracy, including "an unlawful act done in furtherance of the conspiracy"). *See also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396 (3d Cir. 2000) (noting the general rule that "civil conspiracy may not exist without an underlying tort is a common one" and noting it was unaware of any jurisdiction that recognized a civil conspiracy claim without separate tortuous conduct).

[98]    Pl.'s Answering Br. Opp'n 12. Mr. Naples also uses the unemployment division's finding that he was terminated without "good cause" to claim that the parties acted outrageously and in bad faith. As explained below, that definition is inapplicable in this context, and Mr. Naples' reliance on it here is misplaced. *See infra* note 102.

## H. Qualified Immunity as to Claims Against Defendants in Their Individual Capacities

Having found that the Defendants are not liable in their official capacities for any of Mr. Naples' claims, the Court must next determine whether they are in their individual capacities. Defendants have raised the defense of qualified immunity.

Whether the Defendants are due qualified immunity depends on whether they knew their actions violated clearly established constitutional rights. Qualified immunity shields government officials from personal liability for civil damages unless the Plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[99] That is, if a government official "reasonably believes

---

[99] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is a two-prong test. The United States Supreme Court "recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). This alleviates the need for the Court to have to determine a novel question of constitutional law that will end up having no effect on the case's outcome. *See Pearson*, 555 U.S. 223 at 237 ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."). Here, there is no novel question of constitutional law: it is clearly established that a public employee has a property interest in his employment when a statutory condition of that employment is that he may only be terminated for cause. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (finding that a person has legitimate property interest in a job where she has "more than a unilateral expectation of continued employment . . . [that is] a legitimate entitlement to such continued employment," which is in turn determined by reference to state law); *see also Stanford v. State Merit Employee Relations Bd.*, at *4 (Del. May 1, 2012) (finding a state employee had a property interest "derived from the 'for cause' standard imposed by state law").

that his or her conduct complies with the law,"[100] qualified immunity will apply. Qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[101]

Defendants argue they are protected in their individual capacities by qualified immunity. According to Mr. Naples, his termination as a merit employee allegedly without just cause[102] evidences the Defendants' attempt to violate his constitutional rights – in other words, that the Defendants knew they were violating his clearly established right to due process. This was, Mr. Naples argues, not the performance of a discretionary function and therefore does not give rise to qualified immunity. Mr. Naples says Ms. Ashley was aware of her role as the

---

[100]    *Pearson*, 555 U.S. at 244.

[101]    *Id.* at 231.

[102]    Support for Mr. Naples' claim there was no just cause to terminate him mainly comes from the Division of Unemployment Insurance's decision. Defendants argue this reliance is misplaced because the HRAB's test for "just cause" does not and need not incorporate the definition of "just cause" in the unemployment context. The Court agrees that the Unemployment Insurance division's definition of "just cause" is inapplicable here. *See Vann v. Town of Cheswold*, 2007 WL 2319775, at *2 (Del. Super. Ct. Aug. 2, 2007) (finding the term "just cause" lacks a single definition in "the broad spectrum of legal issues under the umbrella of employment law," and that courts have been "reluctant to define just cause"); *AFSCME, Council 81, Registered Nurses Unit, Local 2305 v. State*, 2014 WL 1813279, at *2 (Del. Ch. Apr. 30, 2014) (noting the parties did not specifically incorporate the unemployment compensation definition of just cause in their collective bargaining agreement's standard for discipline).

impartial hearing officer, yet she violated that impartiality by conferring with Mr. Haggerty, who was running the investigation, before and after the hearing.

Defendants respond that Ms. Ashley's role as hearing officer, the minor scheduling delays, and the HRAB's reinstating and suspending Mr. Naples were not clearly established violations. They argue they relied on the applicable County Code provisions at the time, which they used to guide their conduct. Defendants also note that they were aware of other cases where other reinstated employees were initially suspended for more than 30 days.

Mr. Naples has produced no evidence that the Defendants here knew they were violating clearly established constitutional rights. In fact, the Court has found that Mr. Naples has produced no evidence that the Defendants did violate any of his rights to due process as discussed above.[103] Not one of the Defendants can, therefore, be liable in his or her individual capacity; each is entitled to judgment as a matter of law. Summary judgment as to the claims against each Defendant in his or her individual capacity is **GRANTED**.

## V. CONCLUSION

On the record before the Court, there is insufficient evidence to support Mr. Naples' constitutional and defamation claims against the Defendants in their

---

[103] *See McDaniels v. Frick*, 59 F.3d 446, 461 (3d Cir. 1995) ("Inasmuch as the pretermination procedures did not violate [plaintiff's] rights, the individual defendants could not be liable.").

official and individual capacities.  Accordingly, for the reasons stated above, the Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**


*/s/ Paul R. Wallace*_____
**PAUL R. WALLACE, JUDGE**


Original to Prothonotary
cc:  All counsel via File & Serve